FILED
Dec 04, 2019
04:05 PM(ET)
TENNESSEE COURT OF
WORKERS' COMPENSATION
CLAIMS



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## COURT OF WORKERS' COMPENSATION CLAIMS
## AT CHATTANOOGA

| | | |
|---|---|---|
| Johnny Johnston, | ) | Docket Nos.: 2015-01-0023 |
| **Employee,** | ) | 2018-01-0003 |
| | ) | 2018-01-0008 |
| v. | ) | |
| | ) | |
| Siskin Steel & Supply Co./Reliance | ) | State File Nos. 9602-2015 |
| Steel & Aluminum Co., | ) | 266-2018 |
| **Employers,** | ) | 1326-2018 |
| | ) | |
| and | ) | |
| Trumbull Insurance Co., | ) | **Judge Thomas Wyatt** |
| **Carrier.** | | |

---

## COMPENSATION HEARING ORDER AWARDING MEDICAL AND PERMANENT PARTIAL DISABILITY BENEFITS

---

On November 14, 2019, the undersigned held a Compensation Hearing in Johnny Johnston's claim seeking benefits for exposure to heavy-metal contaminants at Siskin Steel & Supply Co./Reliance Steel & Aluminum Company (Siskin). The primary issue was whether Mr. Johnston's liver, cardiac, and kidney conditions arose primarily out of and in the course and scope of employment.[1] For the reasons below, the Court holds they did and awards Mr. Johnston medical and permanent partial disability benefits.

### History of Claim

Mr. Johnston is sixty-one years old with almost forty years of service at Siskin. He sawed, cut, grinded, and welded steel since 1996 and continues to do so today. Siskin considers him an excellent employee. Mr. Johnston has never smoked, and he has not consumed alcohol in the past twenty years.

---

[1] Mr. Johnston filed three separate claims with different dates of injury for each condition. Since each condition allegedly arose from the same occupational exposure, the Court consolidated them into one claim.

Siskin first assigned Mr. Johnston as a laborer in its outdoor scrapyard for ten years. He worked close to areas where aluminum and stainless steel were cut. He ran a machine that bored holes in cast iron and worked in a small building operating machinery that compressed scrap iron into bales. He testified that cutting and boring caused metal chips and particles to attach to his clothing. He described his work in the scrapyard as greasy and dirty and stated the air smelled like diesel exhaust. Mr. Johnston testified that he did not wear respiratory protection on any job at Siskin until approximately three years ago.

Siskin next moved Mr. Johnston inside its large plant. The plant's ceiling stands an estimated 100 feet above the floor, and trucks enter and exit through numerous large bay doors. The plant is not climate-controlled but has fans. Some of the saws and cutting machinery have exhaust fans that remove metal particles from the floor to the atmosphere near the ceiling.

During his first six years inside the plant, Mr. Johnston banded steel and loaded it onto trucks with an overhead crane. He operated the crane in a cab located near the ceiling.[2] In January 1996, Siskin assigned Mr. Johnston to cut steel products inside the plant with various power saws, torches, and a T-splitter (a hot-cutting process.) He also finished steel with a hand-grinder and performed welding. While doing so, Mr. Johnston worked with his face close to the area where the apparatus he used cut, grinded, or welded steel. These processes exposed him to metallic chips, dust, and fumes.

Mr. Johnston testified that he sawed all steels and alloys Siskin manufactured. He described the plant environment as smoky and "rotten," sometimes to the point of burning his eyes. He testified that the smell consisted of fumes from diesel trucks, raw diesel fuel used to clean rusty steel, and cutting fluid used to lubricate saws.

Siskin produced documentation of air-sampling performed in its plant during Mr. Johnston's period of employment. A 2002 study cited concerns that the plant ventilation did not fully protect employees from airborne contaminants. The report recommended improvements in the local exhaust systems and in protecting crane operators from exposure to contaminants removed from the floor.[3] The report identified three primary sources of airborne exposure: diesel exhaust, fumes from hot-cutting operations, and particulates from grinding and sanding. The report noted that employees reported the accumulation of acrid smoke during periods of peak production. It further noted that the 2002 testing was not conducted under worst-case conditions.

---

[2] Air-sampling reports suggested that air quality was worse in the crane cabs because of contaminants lifted by exhaust fans from the floor.

[3] The Court heard no evidence whether the suggested improvements were made.

The 2002 air-sampling revealed that tested employees[4] were exposed to heavy-metal contaminants in levels below OSHA limits during eight-hour testing periods. It also revealed that the largest exposures, by volume, were to zinc oxide, iron oxide, copper, aluminum, and manganese. Other exposures were to silver, cadmium, cobalt, chromium, and lead. The report concluded that "it is clear that airborne contaminants sometimes create an uncomfortable work environment for at least some of your manufacturing personnel." Air-sampling reports from 2006 and 2019 revealed similar results.

In 2013, Mr. Johnston was diagnosed with granulomatous hepatitis with non-alcoholic cirrhosis of the liver. A physician ordered hair testing in November 2014 that revealed elevated heavy-metal contaminants in his system. As a result, the physician recommended chelation treatment. Mr. Johnston presented the hair-testing results to Rick English, a management representative of Siskin,[5] shortly after he received them and requested that Siskin authorize the recommended treatment. Siskin denied the claim, which led Mr. Johnston to file his first claim for benefits in 2015.

Mr. Johnston had a cardiac event in 2016.[6] He was eventually diagnosed with a heart attack caused by coronary artery disease and hypertension. He underwent surgeries for five coronary-artery stents and a pacemaker and missed work for approximately six months. Later, Mr. Johnston learned during an evaluation by Dr. Edward Workman that he was previously diagnosed with chronic kidney disease. He filed claims on his cardiac and kidney conditions shortly after becoming aware of them.

The parties stipulated that the earliest date Mr. Johnston's metal-disease manifested itself was January 20, 2015, and his average weekly wage on that date was $976.41, or a $650.97 compensation rate.

The bulk of the evidence at trial consisted of the deposition testimony of consulting medical experts. No treating physician testified. Mr. Johnston relied on the opinions of Dr. Workman, a Tennessee neuropsychiatrist with a clinical practice in pain management, and Dr. Matthew Lee, a Virginia physician and pharmacist with a segment of his practice devoted to toxicology. Siskin presented the testimony of gastroenterologist Dr. Jonathan Schneider, kidney specialist Dr. Doug Linfert, and cardiologist Dr. William Fleet. They all hold Tennessee licenses and maintain clinical practices.

---

[4] The records indicated Siskin never tested Mr. Johnston's personal exposure to airborne particulate.
[5] Mr. English attended the Compensation Hearing but did not testify.
[6] The event took place at Siskin but was unrelated to physical activity or unexpected mental stimulus.

3

*Dr. Edward Workman's Testimony*

Dr. Workman's primary practice involves the operation of pain-management clinics. He has long-participated in forensic evaluations, including for several government agencies. He performed a physical examination, record review, and impairment evaluation.

Dr. Workman relied on the 2014 hair-testing results to conclude that Mr. Johnston's system contained concentrations of heavy metals in significantly higher-than-accepted levels. He testified he expected adverse health effects from elevated exposure to heavy-metal contaminants. Dr. Workman preferred hair testing over blood or urine testing to determine a patient's long-term, heavy-metal exposure because hair testing quantifies accumulated contaminant levels, while blood and urine testing quantify only acute contaminant levels. Dr. Workman testified the hair testing showed that Mr. Johnston's system had slightly elevated levels of antimony and gadolinium, 4.7 times the accepted level of cadmium, and 4.8 times the accepted level of lead.

Dr. Workman testified that elevated levels of heavy metals were the primary cause of Mr. Johnston's liver disease. However, at first his opinion as to Mr. Johnston's heart and kidney diseases was equivocal. After further researching medical literature, Dr. Workman concluded that metal exposure primarily caused Mr. Johnston's heart and kidney diseases as well. Regarding Mr. Johnston's heart attack, Dr. Workman explained that Mr. Johnston's metal-related liver damage caused systemic hypertension that accounted for his cardiac hypertension, which contributed to his heart attack.

Dr. Workman rated Mr. Johnston's renal impairment at 24%, liver impairment at 21%, and cardiac impairment at 17%, all to the whole body.[7] Dr. Workman testified that Mr. Johnston's combined rating is 59% to the body. Dr. Workman was equivocal on Mr. Johnston's maximum medical improvement date but used April 7, 2017, the date that Mr. Johnston received his pacemaker. Siskin's expert testified that Dr. Workman placed one of Mr. Johnston's diagnoses in an incorrect category, but otherwise, Siskin did not challenge Dr. Workman's impairment ratings.

Dr. Workman admitted he has does not practice gastroenterology, nephrology, or cardiology. Siskin challenged the hair-test reliability based on a disclaimer printed onto the test report stating that the hair test was a screen rather than a diagnostic test. Dr. Workman countered that, standing alone, almost no medical test is diagnostic of any particular condition. He stated he trusted the hair-test results and reiterated that he preferred the hair test to blood or urine tests.

---

[7] Dr. Workman also rated Mr. Johnston for mental and erectile-dysfunction impairments. However, the Court did not consider those ratings.

Siskin also questioned why Dr. Workman concluded that the primary cause of Mr. Johnston's cardiac disease was his exposure to heavy-metal contaminants when he has non-work-related cardiac risk factors such as hypertension, advanced age, diabetes, obesity, and family history of heart disease. Dr. Workman stated that Mr. Johnston's long-term metal exposure supported his opinion. He added that the reviewed medical literature noted heavy metals accumulate in a patient's system and cause or contribute to diabetes, hypertension, and myocardial dysfunction.

*Dr. Matthew Lee's Testimony*

Dr. Lee is a clinical physician, pharmacist, and medical examiner in Richmond, Virginia. His practices involve toxicology, which he defined as investigation of the adverse health effects of substances that do not naturally occur in the human body. He performed a record review without examining Mr. Johnston.

Dr. Lee testified that Mr. Johnston's hair-testing results revealed elevated levels of cadmium, lead, antimony, and arsenic. He described the cadmium and lead elevations as "extreme." He reviewed Siskin's Material Safety Data Sheets and determined that the alloys it manufactures contain the four metallic substances elevated in Mr. Johnston's system. Dr. Lee testified that hair testing is the gold standard for determining the presence of long-term exposure to heavy metals and stated:

> Given Mr. Johnston's exposure, that he's been working with heavy metals for 39 years, 34 of those years without any sort of barrier protection; that he's cutting the metals, that he is creating dust. So that's—makes it the component of the given metal, so he's inhaling those. But also, he's using a torch to cut the metals, which is creating fumes, as well as using various chemicals on top of the metals to help with the process of cutting, so he's exposed to those fumes also.

Dr. Lee added that cadmium, lead, antimony and arsenic are deposited in the liver, kidneys, and spleen. He explained that the duration of a patient's exposure to heavy metals is important because heavy metals have a "really long half-life," meaning the metals are deposited in body tissue and not promptly excreted. He stated that, "[o]ver time . . . a person is continued to be exposed to the heavy metals, the heavy metal will accumulate in the body and become more toxic." Dr. Lee stated that the presence of elevated levels of multiple metals in the system has a synergistic effect that enhances the singular toxic effect of each metal in compromising the body's ability to metabolize and excrete toxic substances.

Dr. Lee found that Mr. Johnston's heavy-metal levels constituted the primary cause of his liver, cardiac, and kidney damage. He also testified that heavy metals caused Mr. Johnston to suffer pulmonary compromise and contributed to his development of

5

diabetes. Dr. Lee supported his position with a number of scientific studies he reviewed in connection with this case.

On another point, Dr. Lee acknowledged that the hair-test report provided a disclaimer about the possibility the results included contaminants that would not be toxic because they accumulate on the external portion of the hair sample. He did not consider the disclaimer to reduce the reliability of the hair-test results because the testing protocol includes washing the hair sample to minimize external contaminants. Dr. Lee also stated that Mr. Johnston's long occupational history of exposure supported the reliability of the hair-testing results.

Dr. Lee conceded he is not board-certified in, nor does he practice in, the fields of gastroenterology, cardiology, or nephrology. He stated that he does not hold a Tennessee medical license, nor did he review the Siskin air-sampling report. Dr. Lee stated he consulted in only two heavy-metal exposure cases previously and testified in only one of them. He stated, however, that he has evaluated patients for heavy-metal-related conditions in his clinical practice.

Dr. Lee testified that he did not review blood-test results in formulating his opinions. He said that blood or urine testing is unnecessary in assessing heavy-metal exposure because the contaminants in hair test travel through the blood before depositing in the hair. Siskin asked Dr. Lee to consider a 2016 blood test that showed Mr. Johnston had normal levels of arsenic, lead, and mercury in his blood.[8] Dr. Lee replied that the blood test did not change his opinion, since Mr. Johnston had started using respiratory protection by 2016. He also pointed out that the blood test showed only the level of contaminant in Mr. Johnston's blood at the time the test was performed, and it did not test for accumulated contaminant levels in the patient's system.

Siskin also asked Dr. Lee why Mr. Johnston's age, cardiac disease, diabetes, and family history were not the primary causes of his liver, cardiac, and kidney conditions. Dr. Lee responded:

> So the heavy metal exposure led to the other health conditions, yes. And as time went on, the development of those diseases, disease processes, further compromised it and made—and allowed for it to continue to get worse. But the primary inciting factor was the heavy metal exposure and the toxic burden and the effect of the heavy metals on the organ systems.

Siskin established that the literature on which Dr. Lee relied was based on animal, rather than human, testing. Dr. Lee stated the lack of human testing did not invalidate the animal testing because medical investigators cannot ethically test toxic substances on

---

[8] The test did not screen for cadmium and antimony.

human beings.

*Dr. Jonathan Schneider's Testimony*

Siskin hired board-certified gastroenterologist Dr. Schneider to perform an examination and records review.

Dr. Schneider testified that Mr. Johnston's liver biopsy showed significant scarring plus cirrhosis at the stage right before "full-blown cirrhosis." He stated he suspected that the cause of Mr. Johnston's liver condition was his underlying diabetes, high cholesterol, and obesity. He declined to testify that Mr. Johnston's metal exposure contributed to his liver condition, since no blood or urine test confirmed the hair-test results. Dr. Schneider stated the medical articles he read did not establish a link between Mr. Johnston's chronic liver condition and his lead, cadmium, antimony, or arsenic exposure.

Dr. Schneider acknowledged that he is not board-certified in occupational medicine nor does he review medical literature on toxicology as a routine part of his practice. Dr. Schneider testified that, had Mr. Johnston been his patient, "given he has the top three risk factors for liver disease, my evaluation as far as cause would have stopped right there."

*Dr. William Fleet's Testimony*

Dr. Fleet is a board-certified cardiologist and internist. He performed a records review. Dr. Fleet testified Mr. Johnston's records reflect a diabetes diagnosis in 2000 and later diagnoses of hyperlipidemia (high cholesterol) and hypertension. He stated the records showed that Mr. Johnston was severely obese, had untreated sleep apnea, and a family history of coronary artery disease.

Dr. Fleet testified that Mr. Johnston had several cardiac diagnoses, including coronary artery disease, atrial fibrillation, congestive heart failure, a left bundle branch block, and a heart attack in 2016. He stated that these diagnoses did not arise primarily out of and in the course and scope of employment because Mr. Johnston had four of the five traditional risk factors for coronary artery disease: diabetes, hyperlipidemia, hypertension, and family history. He stated that Mr. Johnston was at very high risk (over 30%) of having a heart attack from the traditional risk factors irrespective of any occupational exposure. Dr. Fleet stated that the presence of heavy metals in his system only slightly increased his risk of heart attack, and that metal exposure, standing alone, was not the primary cause for Mr. Johnston's cardiac diagnoses and heart attack.

Dr. Fleet admitted he was not a toxicologist or occupational physician. He stated

7

that he did not subscribe to or read the articles cited in support of Drs. Workman's and Lee's causation opinions. He conceded that he did not often obtain detailed histories of his patients' work activities and exposures.

*Dr. Doug Linfert's Testimony*

Dr. Linfert is a licensed, board-certified kidney specialist who sees patients in his office, a dialysis clinic, and the hospital. He examined Mr. Johnston and reviewed his records.

Dr. Linfert testified that Mr. Johnston's records contain evidence since 2013—high creatine levels in the blood—upon which to base a diagnosis of stage-three kidney disease. He stated he would not use the hair test as a diagnostic tool because the test report recommended confirmation of the results by blood or urine testing. He added that blood tests for arsenic, lead, and mercury in 2016 showed Mr. Johnston had normal levels of those metals.

Dr. Linfert testified that Mr. Johnston has three risk factors for kidney disease: diabetes, hypertension, and coronary artery disease. He said that these risk factors rather than metal exposure primarily caused Mr. Johnston's chronic kidney disease. Dr. Linfert stated he did locate some medical literature linking heavy-metal exposure to kidney disease. However, the literature suggested presentations (certain urine findings and/or gout) that Mr. Johnson does not have.

Dr. Linfert is not a toxicologist and has never ordered heavy-metal testing for a patient. He did not investigate the manner in which heavy metals cause kidney damage, nor did he read the articles relied upon by Drs. Workman and Lee. Further, he did not read the Material Data Safety Sheets describing the components of the alloys Siskin manufactured.

### Findings of Fact and Conclusions of Law

*Preliminary Matters*

*i)      Constitutional Challenge*

Mr. Johnston moved to declare a certain portion of the Tennessee Workers' Compensation Law unconstitutional. Siskin responded on the merits but also countered that the Court of Workers' Compensation Claims lacks jurisdiction to decide a facial constitutional challenge. The Court agrees.

In *Richardson v. Board of Dentistry*, 913 S.W.2d 446, 454 (Tenn. 1995), the Supreme Court held that "administrative tribunals 'have no authority to determine the

facial constitutionality of a statute.'"[9] The Supreme Court has held that the Court of Workers' Compensation Claims is an administrative tribunal. *Pope v. Nebco of Cleveland, Inc.*, 2018 LEXIS 145, at *12 (Tenn. Workers' Comp. Panel Jan. 16, 2018).

The Court holds it lacks authority to decide Mr. Johnston's facial constitutional challenge. Consequently, the Court denies his motion.

### ii.) Evidentiary Objections

Shortly before trial, the parties filed dueling motions seeking to exclude or limit the other's expert testimony. Siskin's motion sought exclusion of Mr. Johnston's expert witnesses because they relied on medical articles that Mr. Johnston did not produce in discovery responses. It sought to exclude certain cross-examination testimony of its experts for the same reason.

The Court asked Siskin's counsel exactly which discovery request required Mr. Johnston to produce copies of medical articles reviewed by his experts. He directed the Court to Request for Production 13 (RFP 13), which requests "[a]ll documents stating, recognizing, listing or otherwise addressing the extent or existence of industrial impairment alleged to have been suffered by the Employee . . . including any documents created in connection with any vocational evaluation of the Employee."

The articles Siskin complains of were those reviewed by Mr. Johnston's medical experts in their causation investigation. The articles do not relate to "industrial impairment" and "vocational evaluation" as referenced in RFP 13. For that reason, the Court denies Siskin's motion in limine.

Mr. Johnston moved to exclude the testimony of Siskin's expert witnesses because they are not toxicologists and, thus, insufficiently qualified to testify in this case. The Court located no legal authority, and none was cited, indicating that only toxicologists or occupational disease physicians are competent to testify in an occupational disease claim. Licensed physicians may testify as experts in workers' compensation cases. The specific qualifications of a physician may go to the weight given the expert's testimony, but they do not disqualify the physician from offering expert testimony. Thus, the Court overrules Mr. Johnston's motion.

### Evidentiary Standard

At this Compensation Hearing, Mr. Johnston must establish by a preponderance of the evidence that he is entitled to the requested benefits. Tenn. Code Ann. § 50-6-

---

[9] A facial challenge is one based on the position that a statute is unconstitutionally no matter how the judge interprets or applies it.

239(c)(6) (2019); *Willis v. All Staff,* 2015 TN Wrk. Comp. App. Bd. LEXIS 42, at *18 (Nov. 9, 2015).

## *Causation*

Mr. Johnston bears the burden of proving by a preponderance of the evidence that his alleged occupational disease arose primarily out of and in the course and scope of his employment at Siskin. *See* Tenn. Code Ann. § 50-6-102(14).

The current Workers' Compensation Law does not specifically define the term "occupational disease." However, in *Pool v. Jarman D & Q Transport,* 2016 TN Wrk. Comp. App. Bd. LEXIS 9, at *9 (Feb. 18, 2016), the Workers' Compensation Appeals Board observed that an occupational disease develops slowly, and it is injury from the disease, rather than the disease itself, that entitles the employee to benefits. Thus, Mr. Johnston must prove by the preponderance of the evidence that he developed an occupational disease related to his exposure to heavy metals at Siskin. The Court holds that Mr. Johnston met his burden of proof.

The Court finds that Mr. Johnston credibly described the work he performed at Siskin and his exposure to heavy-metal dust and other contaminants while performing the work. Siskin did not present evidence to rebut Mr. Johnston's testimony other than producing air-sampling reports documenting that tested employees received exposures of heavy metals thatdid not exceed OSHA limits.

The Court believes Mr. Johnston's testimony that he worked with his face in areas where airborne heavy-metal contaminants were created by his application of saws, torches, hot-cutting processes, hand grinders, and welding equipment in direct contact with the metal alloys Siskin manufactured. The Court also believes Mr. Johnston's testimony that he performed his work without respiratory protection until approximately three years ago. Based on this evidence, the Court finds that Mr. Johnston has been exposed to heavy-metal contaminants at Siskin for many years.

The Court next considers whether the preponderance of the evidence establishes that heavy-metal contaminants accumulated in Mr. Johnston's system. This issue turns on the reliability of the 2014 hair test. Mr. Johnston's experts accepted the reliability of the hair-test results. They testified that Mr. Johnston's lengthy heavy-metals exposure history bolstered the reliability of the test results because heavy metals accumulate over the duration of exposure. Drs. Workman and Lee also stated that hair-test results are more helpful than blood and urine testing in detecting the long-term presence of heavy-metal contaminants because blood and urine tests detect only the acute presence of contaminants, while hair testing measures accumulated contaminant levels.

Siskin's experts testified they would not have relied on the hair-test results without

confirmation by blood and urine testing. Because the only blood-test results in Mr. Johnston's records were negative, they concluded the record contained no evidence that Mr. Johnston had elevated levels of heavy-metal contaminants in his system. The Court noted, however, that the physician who ordered the hair test relied on its findings to recommend treatment for heavy-metal exposure. Considering the evidence as a whole, and giving due weight to Mr. Johnston's lengthy exposure to heavy-metal contaminants at Siskin, the Court finds that Mr. Johnston accumulated elevated levels of cadmium, lead, antimony, and arsenic in his system during his employment at Siskin.

The Court next considers whether Mr. Johnston proved that his liver, cardiac, and kidney conditions arose primarily from his work-related exposure. This requires the Court to assess conflicting expert witnesses. When confronted with conflicting expert opinions, the Court has discretion to conclude which of the experts' positions contains the more probable explanation and should govern the decision in the case. *Ledford v. Mid-Georgia Courier, Inc.,* 2018 TN Wrk. Comp. App. Bd. LEXIS 28, at *8 (June 4, 2018). In evaluating the opinions, the Court may consider, among other things, the qualifications of the experts, the circumstances of their evaluation, the information available to them, and the evaluation of the importance of that information by other experts. *Hollis v. Komyo Amer.,* 2019 TN Wrk. Comp. App. Bd. LEXIS 4, at *11 (Jan. 22, 2019).

All the medical experts were sufficiently trained, credentialed, and clinically experienced. No one expert stood above the other. All the experts reviewed Mr. Johnston's medical records. Some reviewed the air-sampling data and the Material Safety Data Sheets, and others did not. Some examined Mr. Johnston in their offices, and others solely reviewed his records. Despite the differences, the Court holds that all experts had sufficient information to formulate their causation opinions.

Where Mr. Johnston's and Siskin's experts differed was in the methodologies they took in addressing causation. Drs. Workman and Lee concluded that Mr. Johnston had elevated levels of heavy-metal contaminants in his system and then researched the medical literature to determine if scientifically-documented links exist between liver, cardiac, and kidney conditions and those metals. Both Drs. Workman and Lee testified in detail as to the specific sources they read in researching causation. They supported their opinions that Mr. Johnston's conditions arose primarily out of and in the course and scope of employment with the literature they identified.

In contrast, Siskin's experts focused on Mr. Johnston's diagnoses of diabetes, coronary artery disease, hypertension, and family history of heart disease to determine the primary cause of his conditions. Dr. Schneider stated that, if Mr. Johnston had presented to him as a patient, his determination of the cause of his liver problems would end with the knowledge that Mr. Johnston had those conditions. Drs. Fleet and Linfert performed vaguely-described literature research for links between heavy-metal exposure and liver, cardiac, and kidney conditions based on human testing. Siskin's experts minimalized the

hair-test results and relied on the negative blood testing. They concluded that, even if Mr. Johnston had elevated heavy-metal levels in his system, that exposure would only slightly increase the chances of his liver, cardiac, and kidney diagnoses, given his non-work-related risk factors.

Considering the expert opinions and other evidence, the Court holds that the causation opinions of Drs. Workman and Lee give the more probable explanation for the development of Mr. Johnston's liver, cardiac, and kidney conditions. The Court finds it significant that Mr. Johnston's work exposed him without protection for more than two decades to heavy-metal contaminants that accumulate in the body. The Court further considered the improbability of Mr. Johnston developing non-alcoholic cirrhosis of the liver, respiratory issues without smoking, and cardiac and kidney conditions without the intervention of his exposure to heavy metals at Siskin. The Court holds that Mr. Johnston proved by a preponderance of the evidence that his liver, cardiac, and kidney conditions arose primarily out of and in the course and scope of employment.

*Medical Benefits*

The foundational benefit of the Workers' Compensation Law is medical treatment, free of cost to the employee, for injuries and conditions that arise primarily out of and in the course and scope of employment. *See generally* Tenn. Code Ann. § 50-6-204. However, the injured worker shall receive treatment for his work-related condition by a physician selected from an employer-provided panel. Tenn. Code Ann. § 50-6-204(3)(A)(i). The Court holds Mr. Johnston is entitled to medical benefits for ongoing treatment of his liver, cardiac, and kidney conditions.

Siskin's denial of his claim required Mr. Johnston to obtain treatment on his own. However, because Mr. Johnston developed evidence that his conditions are work-related after he gave Siskin notice of his claim, the Court holds that Siskin shall provide panels of qualified physicians in Mr. Johnston's community for ongoing treatment of his work-related liver, cardiac, and kidney conditions.

*Temporary Disability Benefits*

As to temporary total disability benefits, Mr. Johnston must prove by a preponderance of the evidence: (1) a disability from working as the result of a compensable injury; (2) a causal connection between the injury and the inability to work; and (3) the duration of the period of disability. *Shepherd v. Haren Const. Co., Inc.*, 2016 TN Wrk. Comp. App. Bd. LEXIS 15, at *13 (Mar. 30, 2016). Here, Mr. Johnston simply testified that he missed work after his heart attack and did not prove the dates he was off work following his heart attack. The evidence introduced at trial is insufficient to establish the necessary elements for an award of temporary disability benefits, and the Court declines to award them.

*Permanent Partial Disability Benefits*

The Workers' Compensation Law provides for permanent partial disability benefits. Tenn. Code Ann. § 50-6-207(3)(A). Here, Dr. Workman testified to the permanency of Mr. Johnston's conditions and assigned a 59% whole-body impairment rating based on the combined ratings. Siskin did not challenge Dr. Workman's impairment rating, other than to offer the testimony that he placed one of Mr. Johnston's conditions in the incorrect classification. The Court holds that the preponderance of the evidence establishes that Mr. Johnston's liver, cardiac, and kidney conditions are permanent and his combined impairment rating for the conditions is 59% to the body.

The Court holds that Mr. Johnston sustained a single occupational disease from his exposure to heavy-metal contaminants at Siskin that manifested in his development of liver, cardiac, and kidney conditions. The parties stipulated that January 20, 2015, was the earliest manifestation date for Mr. Johnston's heavy-metal-related diseases. The parties further agreed that, on that date, Mr. Johnston's compensation rate was $650.97.

Tennessee Code Annotated section 50-6-207(3)(A) provides that an employee with a permanent work injury shall receive an original award of permanent partial disability benefits "for the period of compensation" calculated by multiplying the employee's impairment rating by 450 weeks. The payment of the award begins on the date of maximum medical improvement. *Id.*

The Court awards Mr. Johnston an original award of 265.5 weeks of benefits, or $172,832.00. The Court makes no ruling on Mr. Johnston's entitlement to a resulting award because his initial compensation does not expire until May 10, 2022. *See* Tenn. Code Ann. § 50-6-207(3)(B). Benefits shall be paid in the amount of $650.97 per week. Accrued benefits shall be paid to Mr. Johnston in a lump sum from the date of maximum medical improvement—April 7, 2017—until the date of the first payment under this order. Afterward, Siskin shall pay Mr. Johnston weekly or biweekly until the full 265.5 weeks of benefits are exhausted on May 10, 2022.

The Court does not address Mr. Johnston's counsel's attorney's fees and costs. Mr. Johnston's counsel shall file a petition addressing these issues as soon as practicable.

This Court taxes the filing fee of $150.00 to Siskin under Tennessee Compilation Rules and Regulations Rule 0800-02-21-.06. Further, Siskin shall prepare and submit a Statistical Data Form within ten days of the date of judgment. Absent an appeal, this order shall become final in thirty days.

**IT IS ORDERED.**

**ENTERED December 4, 2019.**

_Thomas L. Wyatt_

**Judge Thomas Wyatt**

**APPENDIX**

Technical record:

1. Petition for Benefit Determination—Liver
2. Petition for Benefit Determination—Heart
3. Petition for Benefit Determination—Kidney
4. Dispute Certification Notices
5. Order of Consolidation
6. Scheduling Order
7. Discovery Order
8. Order Denying Motion to Quash
9. Joint Pre-Compensation Hearing Statements
10. Employer's Motion in Limine
11. Employer's Witness and Exhibit List
12. Employee's Witness and Exhibit List
13. Employee's Response to Motion in Limine
14. Employee's Motion to Exclude Employer's Expert Witnesses
15. Employer's Response to Motion to Exclude
16. Employee's Motion to Declare "Primary Cause" Portion of Workers' Compensation Act Unconstitutional
17. Employer's Response to Constitutionality Motion
18. Employer Brief
19. Employee Brief

Exhibits:

1. Employer's Discovery Requests (Request for Production of Documents 13)
2. Dr. Edward Workman's Deposition Transcript
3. Dr. Matthew Lee's Deposition Transcript
4. Dr. Doug Linfert's Deposition Transcript
5. Dr. William Fleet's Deposition Transcript
6. Dr. Jonathan Schneider's Deposition Transcript
7. Medical Records Submitted by Employee
8. Medical Records Submitted by Employer

9. Documentation of Mr. Johnston's Assignment as a Saw Operator
10. TOSHA Records
11. 2019 Air Sampling Records
12. 2002 Report About Ventilation at Siskin
13. 2002 Air Sampling Records
14. 2006 Air Sampling Records

## CERTIFICATE OF SERVICE

I certify that a copy of the Order was sent as indicated on December 4, 2019.

| Name | Certified Mail | Email | Service sent to: |
|------|----------------|-------|------------------|
| Linn Guerrero-Justice Employee Attorney | | X | linn@loringjustice.com |
| John Barringer Employer Attorney | | X | jbarringer@manierherod.com |

Penny Shrum, Court Clerk
**WC.CourtClerk@tn.gov**

15



<u>Compensation Hearing Order Right to Appeal:</u>

If you disagree with this Compensation Hearing Order, you may appeal to the Workers' Compensation Appeals Board or the Tennessee Supreme Court. To appeal to the Workers' Compensation Appeals Board, you must:

1. Complete the enclosed form entitled: "Compensation Hearing Notice of Appeal," and file the form with the Clerk of the Court of Workers' Compensation Claims *within thirty calendar days* of the date the compensation hearing order was filed. When filing the Notice of Appeal, you must serve a copy upon the opposing party (or attorney, if represented).

2. You must pay, via check, money order, or credit card, a **$75.00 filing fee** *within ten calendar days* after filing of the Notice of Appeal. Payments can be made in-person at any Bureau office or by U.S. mail, hand-delivery, or other delivery service. In the alternative, you may file an Affidavit of Indigency (form available on the Bureau's website or any Bureau office) seeking a waiver of the filing fee. You must file the fully-completed Affidavit of Indigency *within ten calendar days* of filing the Notice of Appeal. **Failure to timely pay the filing fee or file the Affidavit of Indigency will result in dismissal of your appeal.**

3. You bear the responsibility of ensuring a complete record on appeal. You may request from the court clerk the audio recording of the hearing for a $25.00 fee. A licensed court reporter must prepare a transcript and file it with the court clerk *within fifteen calendar days* of the filing the Notice of Appeal. Alternatively, you may file a statement of the evidence prepared jointly by both parties *within fifteen calendar days* of the filing of the Notice of Appeal. The statement of the evidence must convey a complete and accurate account of the hearing. The Workers' Compensation Judge must approve the statement of the evidence before the record is submitted to the Appeals Board. If the Appeals Board is called upon to review testimony or other proof concerning factual matters, the absence of a transcript or statement of the evidence can be a significant obstacle to meaningful appellate review.

4. After the Workers' Compensation Judge approves the record and the court clerk transmits it to the Appeals Board, a docketing notice will be sent to the parties. The appealing party has *fifteen calendar days* after the date of that notice to submit a brief to the Appeals Board. *See the Practices and Procedures of the Workers' Compensation Appeals Board.*

**To appeal your case directly to the Tennessee Supreme Court, the Compensation Hearing Order must be final and you must comply with the Tennessee Rules of Appellate Procedure. If neither party timely files an appeal with the Appeals Board, the trial court's Order will become final by operation of law thirty calendar days after entry.** *See* **Tenn. Code Ann. § 50-6-239(c)(7).**

*For self-represented litigants: Help from an Ombudsman is available at 800-332-2667.*



## COMPENSATION HEARING NOTICE OF APPEAL
Tennessee Division of Workers' Compensation
www.tn.gov/labor-wfd/wcomp.shtml
wc.courtclerk@tn.gov
1-800-332-2667

Docket #: _____

State File #/YR: _____

_____
**Employee**

**v.**

_____
**Employer**

### Notice
Notice is given that _____

[List name(s) of all appealing party(ies) on separate sheet if necessary]

appeals the order(s) of the Court of Workers' Compensation Claims at _____

_____ to the Workers' Compensation Appeals Board.

[List the date(s) the order(s) was filed in the court clerk's office]

Judge_____

### Statement of the Issues
Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____

_____

_____

### List of Parties

Appellant (Requesting Party):_____ At Hearing:☐Employer☐Employee

Address:_____

Party's Phone:_____ Email:_____

Attorney's Name:_____ BPR#: _____

Attorney's Address:_____ Phone: _____

Attorney's City, State & Zip code:_____

Attorney's Email:_____

*Attach an additional sheet for each additional Appellant*

Employee Name:_____ SF#:_____ DOI:_____

## Appellee(s)
**Appellee (Opposing Party):**_____At Hearing:☐Employer☐Employee

Appellee's Address: _____

Appellee's Phone: _____ Email:_____

Attorney's Name: _____ BPR#: _____

Attorney's Address: _____ Phone: _____

Attorney's City, State & Zip code: _____

Attorney's Email: _____

*\* Attach an additional sheet for each additional Appellee \**

## CERTIFICATE OF SERVICE

I,_____, certify that I have forwarded a true and exact copy of this
Compensation Hearing Notice of Appeal by First Class, United States Mail, postage prepaid, to all
parties and/or their attorneys in this case in accordance with Rule 0800-02-22.01(2) of the Tennessee
Rules of Board of Workers' Compensation Appeals on this the_____ day of_____, 20___.

[Signature of appellant or attorney for appellant]    _____

Attention: This form should only be used when filing an appeal to the Workers' Compensation Appeals
Board. If you wish to appeal a case to the Tennessee Supreme Court, please utilize the form provided by
the Court which can be found on their website at the following address:
http://www.tncourts.gov/sites/default/files/docs/notice_of_appeal_-_civil_or_criminal.pdf



**Tennessee Bureau of Workers' Compensation**
220 French Landing Drive, I-B
Nashville, TN 37243-1002
800-332-2667

### AFFIDAVIT OF INDIGENCY

I, _____, having been duly sworn according to law, make oath that because of my poverty, I am unable to bear the costs of this appeal and request that the filing fee to appeal be waived. The following facts support my poverty.

1. Full Name: _____    2. Address: _____

3. Telephone Number: _____    4. Date of Birth: _____

5. Names and Ages of All Dependents:

_____ Relationship: _____

_____ Relationship: _____

_____ Relationship: _____

_____ Relationship: _____

6. I am employed by: _____

My employer's address is: _____

My employer's phone number is: _____

7. My present monthly household income, after federal income and social security taxes are deducted, is:

$ _____

8. I receive or expect to receive money from the following sources:

| | | | |
|---|---|---|---|
| AFDC | $ _____ per month | beginning | _____ |
| SSI | $ _____ per month | beginning | _____ |
| Retirement | $ _____ per month | beginning | _____ |
| Disability | $ _____ per month | beginning | _____ |
| Unemployment | $ _____ per month | beginning | _____ |
| Worker's Comp. | $ _____ per month | beginning | _____ |
| Other | $ _____ per month | beginning | _____ |

LB-1108 (REV 11/15)                                                           RDA 11082

9. My expenses are:

Rent/House Payment $ _____ per month    Medical/Dental $ _____ per month

| Groceries | $ _____ per month | Telephone | $ _____ per month |
| Electricity | $ _____ per month | School Supplies $ _____ per month |
| Water | $ _____ per month | Clothing | $ _____ per month |
| Gas | $ _____ per month | Child Care | $ _____ per month |
| Transportation | $ _____ per month | Child Support | $ _____ per month |
| Car | $ _____ per month |
| Other | $ _____ per month (describe: _____) |

10. Assets:

| Automobile | $ _____ | (FMV) _____ |
| Checking/Savings Acct. $ _____ |
| House | $ _____ | (FMV) _____ |
| Other | $ _____ | Describe: _____ |

11. My debts are:

| Amount Owed | To Whom |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

**I hereby declare under the penalty of perjury that the foregoing answers are true, correct, and complete and that I am financially unable to pay the costs of this appeal.**

_____
APPELLANT


Sworn and subscribed before me, a notary public, this

_____ day of _____, 20_____.


_____
NOTARY PUBLIC

My Commission Expires: _____